### John P. Hunter *versus* Lyman Perry.

Where articles of property are liable to a corporation to pay tolls, (such for instance as boomage upon logs,) and the corporation is by law authorized to sell the articles for the tolls at public auction; *it seems,* that on grounds of public policy, such a sale will pass a valid title to the purchaser; although the proceedings of the officers of the corporation, in relation to the custody of the articles and to the sale itself, are irregular and defective.

Thus a boom corporation, having such powers, collected logs, and after those belonging to certain owners had been redeemed and taken away, proceeded to sell at auction all the residue, comprising logs of many different marks, values and ownerships : —

*Held,* that a valid title passed to the purchaser, although the proceedings of the officers of the corporation, pertaining to the taking and keeping of the logs and to the sale, were irregular and defective; *and* although they sold more of the logs of each owner than were necessary to pay the tolls and expenses due upon the logs of such owner, *and* although the sale was made collectively of all the logs in the boom, without any regard to ownerships, or to the respective amounts due upon them; *and* although the sale was had, not on the day prescribed in the charter, but on a subsequent day, by an adjournment not provided for in the charter.

On report from *Nisi Prius*, Howard, J. presiding.

Assumpsit upon a promissory note.

There is a corporation called the Kennebec Log Driving Company. It has authority, in the fall of the year, to collect

from other booms, and lodge in certain deposit booms of its own, all logs, (with an excepted class not necessary to be here described.) Upon the logs thus lodged in the deposit booms, a toll accrues to the company. If after certain prescribed notifications, the tolls be not paid, the treasurer is authorized, upon specified preliminary measures, to sell the logs at auction.

In July, 1845, the company employed the plaintiff to collect the logs into the deposit booms, and to do whatever, in such a case, pertained to the company to perform, and stipulated to allow him for his expenses and services, whatever boomage-money he might collect.

In the fall of 1845, he got together and deposited a large quantity of logs of many various marks, values and ownerships. The treasurer then advertised in certain newspapers, the time and place for selling, at auction, such of the logs as should not have been previously redeemed by the owners. At that sale, the treasurer sold all the unredeemed logs. A portion of them was struck off to one Coburn, who, with the plaintiff's consent, transferred the bargain to the defendant, who then entered into the following contract with the plaintiff : —

" Whereas there is now deposited in two certain booms near the shore of Thomas N. Atkins, a quantity of logs called scrabble logs, supposed to be about 600 in number, and which logs I have purchased of *J. P. Hunter, an agent of the Ken. Log Driving Company* at $7⅔ per M, for the merchantable in the lower boom, and $7 in the upper boom, at a straight and sound scale, and 25 cents per log, for those which are not equal to 100 feet. And as owing to the weather said logs cannot now be surveyed, I hereby agree to pay the aforesaid prices for all the scrabble logs in said boom, except those of the description excluded from the sale at auction by said company. I further agree that said logs shall be at my risk till they can be surveyed. Payment to be made by a note or notes on six months, with interest. And I, J. P. Hunter, hereby agree to the above.

" Dec. 1, 1845.                          " Lincoln Perry.

                                        " J.  P.  Hunter."

On the back of the instrument is the following indorsement. " Dec. 1, 1845. — Rec'd of Lincoln Perry his note for three hundred dollars, payable at the Franklin Bank in Gardiner, in six months, with interest, which note I am to account for to him on final settlement, for the within named logs.

"J. P. Hunter."

This $300 note is the one now in suit.

After the introduction of testimony by the parties, and a reference to the charter, a default was submitted to, which is to be taken off, if in view of the evidence, the action is maintainable.

It appeared, as the Court viewed the testimony, that after the sale to the defendant he took possession of the logs, but they were allowed to lie in the boom through the winter. In the following spring they were nearly all swept away by a freshet ; and some of the testimony tended to show that, of the residue, the original owners took their own wherever they could find them.

The testimony of several of the witnesses tended to establish the facts, stated and relied upon in the argument for the defence. It was testified that, after the purchase by the defendant, a person was directed by the plaintiff to take care of the logs in the deposit booms, and to deliver any of them that the owners might call for upon the payment of the boomage and some additional expenses, and that the plaintiff was then employed in securing the logs at said booms.

Other facts are stated in the opinion of the Court.

*Whitmore*, for the defendant.

By the charter and its additional Acts, the company is required to " raft the logs of the individual owners, (whose marks may be furnished by such owners to the clerk or master raftsman,) by themselves ;" this was not done. Also, that the logs of the several owners shall be " counted and deposited" in the booms of the company before the sale ; but they were never counted.

The company did not sell merely so many of the logs of

each owner as would pay for the boomage and expenses upon the logs of such owner. They sold all the logs in the deposit booms, regardless of ownerships. The logs were of various values, and owned in different proportions by the several proprietors. Thus by the sale of all of one man's logs, he was made to pay the debts of other men. More logs were sold than were necessary to pay all boomage and expenses. Some of them, then, were unlawfully sold, and to them the defendant could take no right. If so, the contract was invalid for the whole.

The *Act is imperative, that the sales should be made on* the first Tuesday of November, annually. The sale in question, though advertised for the proper day, was adjourned to a subsequent day. This was wrongful. It evaded competition. If in opposition to the statute, the sale could be had on any other day, it must be from some urgent necessity. No such necessity is pretended.

The company had no right to sell, except for cash. 26 Maine, 309.

The defendant got no title to any of the logs. The original owners took all of them which were to be found after the freshet. They had a right to do so, for no title to any portion ever vested in the defendant, and he in fact never had the benefit of so much as a single log.

It was inserted in the contract, that the logs were to be at the defendant's risk. This stipulation was only upon the ground that the defendant should obtain a title. It was a mere adjective to the ownership, and no part of the consideration of the note.

The case also shows that the sale was rescinded; for the plaintiff afterwards had the possession of the logs, and employed the witness to deliver them to the original owners, when called for.

The note was therefore without consideration.

The counsel pointed out several other particulars, in which he contended that there were fatal delinquencies in the pro-

ceedings of the corporation, but which the Court seem to have classed with the irregularities already mentioned.

He then contended that, by the contract, upon which this note was given, the plaintiff set aside the auction sale by the company, and sold the logs himself to the defendant. The price for which they were sold and the manner of the sale are entirely different from any auction sale. The plaintiff was to have $7⅔ per M. for a part, and $7 per M. for a part, and a portion of the logs, although all are equally taxed, (viz. 25 cents per log,) is sold by the stick at 25 cents per stick. Nothing can be more absurd than such a sale for such a purpose ; no title passed by it, not even a lien for boomage.

The Kennebec Log Driving Company was incorporated for the public good as well as the interest of the members of the company.

They could have no authority to delegate their powers, and convey the benefit of their franchise to J. P. Hunter. It may be supposed that peculiar confidence was reposed in the company by the Legislature, that they would manage the rafting operations in the most prudent manner ; and that they would regard the interest of the log owners. But, by the contract copied, John P. Hunter is invested with all the authority of the company. The franchise of the company is conferred on him as a matter of favoritism and personal emolument.

*Evans,* for the plaintiff.

TENNEY, J. — The suit is defended on the ground, that no consideration passed from the plaintiff to the defendants, for the note, which is the alleged cause of action. The directors of the Kennebec Log Driving Company, on July 2, 1845, made a contract with the plaintiff, by which he agreed seasonably to raft up, agreeably to the statute of 1845, chap. 242, all the logs to be found between Augusta bridge, and Trott's cove ; and taking said act for his guide, to do every thing required by the same, of the company, including the boomage therein prescribed, the whole to be done to the approval of the directors, or their successors. And in considera-

tion of the plaintiff's agreement, the directors authorized and empowered him, to demand and receive all the sums of money, perquisites and advantages, which the directors or the company were entitled to, which moneys so received were to be in full consideration of the services contracted by him to be performed.

The note was given for certain logs, which the plaintiff under the authority of that agreement had collected upon the river, and placed in the deposit booms, called the "scrabble logs," and were among those which were there deposited, consisting of a great number and variety of marks, and belonging to many different persons, few being of any one mark. Notice was given by the company to all persons owning logs, to pay the expenses thereon, and take them away, and many owners received their logs. Those remaining, and not having been called for, were sold at auction to pay expenses thereon, by the treasurer of the company, under a warrant from the directors, and upon a notice of the time, place and object of the sale. Portions of the logs in the deposit booms were purchased by one Bradstreet, and another portion by Hanson and Palmer. After that five hundred sticks were bid off by Abner Coburn ; and all remaining afterwards of those which were sold, were bid off in a lot by said Coburn, estimated at six hundred logs. The lot of five hundred sticks were surveyed, and all the logs sold were entered upon the books of the company, excepting the lot last sold. After the auction, Coburn transferred his right to the defendant Perry, upon condition that the transfer should be satisfactory to the plaintiff, to whom he referred him to adjust the business. It was stipulated at the auction, that the purchasers should take the logs at the booms. On Dec. 1, 1845, Perry and the plaintiff entered into a written agreement, in which the former admits, that he had purchased of the latter, agent of the Kennebec Log Driving Company, a quantity of logs, estimated at six hundred in number, called "scrabble logs," for prices in some respects higher than the offer of Coburn, to whom they were sold at the auction, and as the weather at the time prevented a survey of the logs, it

was therein agreed by Perry, that he should pay the prices specified for the logs, and the logs so purchased were to be at his risk, till the survey, and payment to be made by note or notes payable in six months with interest.

The logs purchased by Bradstreet, and Palmer and Hanson, were taken away, and it was in proof that all might have been removed and secured during the fall and winter, after the sale. Perry was at the boom several times, subsequent to his becoming interested in the logs, and rafted out some of them, bought rigging and put on them, and left it there till after the river was frozen. He was on the logs several times. They were carried away in the freshet the spring following, excepting those removed by Perry.

The counsel for the defendant has pointed out irregularities in the course pursued by the officers of the company, in taking possession of the logs, and in their sale, which he relies upon, as fatal to the validity of the title attempted to be conferred upon him. If the right of a purchaser of personal property at such a sale is to be defeated by any defect in the proceedings touching the same, it is not impossible that the title of Perry to the logs would be pronounced imperfect, at least.

The logs having been taken into the possession of the company, and the treasurer having undertaken to sell them, according to the provisions of the statute, the sale accompanied by the possession of the purchasers, may be regarded as analogous in some respects to sales of chattels by a sheriff, and the legal effects thereof, also similar. And it has been held generally, the purchaser of a chattel at a sheriff's sale, having received the goods and paid for them, will have the property, notwithstanding any irregularity in the proceedings against the former owner, from whom they were taken as his property. Purchases would not be made, and the interest of both debtor and creditor would suffer, if sales made by one having lawful authority, and appearing to have exercised it lawfully, should be avoided on account of some irregularity, *Ladd* v. *Blunt*, 4 Mass. 402 ; *Titcomb* v. *Union Marine and Fire Ins. Co.*, 8 Mass. 326 ; *Howe* v. *Starkweather*, 17 Mass. 240. These author-

ities are cited with approbation by the Court in the case of *Clark* v. *Foxcroft*, 6 Greenl. 296, where it is said, that the doctrine deducible from these authorities, and from the common law, is, that the title of a purchaser of goods under a sheriff's sale, upon *fieri facias*, may be good, although the officer making it, may have been guilty of important omissions of duty, in the proceedings required.

It is certainly unreasonable for a person, who has purchased property at a sale authorized under the law, by the one making it, to object to the payment of the consideration, upon the ground that the sale is irregular, when he has taken possession of the goods, and has the enjoyment of that which he has attempted to obtain. It is believed to be a well settled principle, that by such a purchase and possession, the title of the debtor passes to the purchaser; and notwithstanding irregularities in the proceedings connected with the sale, it is not in the power of the latter, when he may have lost the property by his own carelessness, to invoke the pretended claim of a stranger, as an excuse for withholding payment of the consideration, especially when the stranger is totally unknown, whose interests are at best vague and uncertain, and when no suggestion is made, that any attempt to interfere with his title is intended.

The condition of the supposed claimants of the logs, may be compared with the assignee of a bankrupt, when the latter brings a suit against his debtor. It is not competent for the party liable, originally, to the bankrupt, to defend the suit on the ground that all the interest in the claim has vested in the assignee; no one having a right to deprive the bankrupt of that which was his, excepting those who claim regularly under the commission. *Fowler* v. *Daun*, 1 Bos. and Pul. 44, in which Heath, J. says — "an uncertificated bankrupt has a defeasible property, which none but the assignee can defeat." *Clark* v. *Calvert*, 8 Taunton, 742.

The company had possession of the logs; and for the expenses incurred by causing them to be deposited in the booms under the law, for the purpose of making them secure, they had a lien upon them. The sale was made by the officer of the

Hunter *v.* Perry.

company, who had the power to make it. It was attempted to be made according to the provisions of the statute. At the sale the logs were bid off, and the right acquired by the one who bid them off obtained by Perry, by the assent and agreement of the plaintiff, who was duly authorized by the company to make the agreement. Perry obtained all that he sought, and gave his note therefor, when he had a full opportunity, by ordinary care, to acquire a knowledge of all the facts. It is not suggested that he was in any manner misinformed in reference to the proceedings, or did not know fully every step, which had been taken before and at the sale. He had what must be treated as perfect possession of the property, and when in his possession had contracted that it should be at his own risk.

A modification of the terms of the sale at auction to Coburn, made in a contract, in which Perry was a party, to his satisfaction, if not by his procurement, could not be injurious to any party, and was without effect upon the sale, which had then been made and completed. The case of *Cushing* v. *Longfellow*, 26 Maine, 306, relied upon by the defendant is unlike the one before us. That was a sale of real estate, which is governed by very different principles from those applicable to chattels. And the credit which was given by the county treasurer in that case, was in the conditions of the sale. In this case no *such* credit was given, and the credit in the note was in pursuance of an agreement after the sale, between the company's agent and the defendant Perry. In this respect, it is precisely similar to the case of *Longfellow* v. *Quimby & al.* 29 Maine, 196, where a note was taken by the county treasurer on time, after the sale, but not in pursuance of the stipulations made previously. A sale and delivery of goods which are tangible, and can be removed, may be sufficient to pass the title, though the officer after the sale may take a note for the purchase money, at a price greater that that, at which they were struck off at the auction.

It is contended, that the agreement of December 1, 1845, is proof of an abandonment of the sale at auction, was unauthorized, and passed no title to the property. It is not ap-

parent, that the purchase at auction, under the offer of Coburn, was intended to be surrendered, but it does appear from the evidence, that the purchase was claimed by Perry, with some change in the amount and terms of payment, which were probably made for his benefit and at his request. If the purchase was abandoned, the consideration of the note has not failed. The plaintiff was the authorized agent of the company, who had a claim upon the logs for the payment of the expenses incurred thereon. An abortive attempt to make a public sale did not discharge that lien. The right of possession was in the company, which could not be divested, excepting by the discharge of the lien by payment or otherwise. No one appeared to claim the logs after notice. That such a claim from one, having had at any time an interest in them, would be made, after the note was given, is certainly improbable. The note was given on account of the logs, with as full a knowledge of all the facts, as he has acquired since the purchase, for aught which appears in the case. He treated the company as the owner before the sale, and claimed the benefit of it afterwards. The logs were in his possession and at his risk, and a part actually taken away. The sale without any qualification implies a warranty of title. No one has attempted to interfere with the rights acquired by Perry, under the purchase, by a claim upon the logs or their value; and the note must be regarded as unimpeached.

*Judgment on the default.*